SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT; Catlin Canal Company; High Line Canal Company; Arkansas Valley Ditch Association; District 67 Irrigation Canal Association; and Amity Mutual Irrigation Co., Objectors and Appellants, Cross-Appellees,

v.

FORT LYON CANAL COMPANY, Applicant, Appellee, and Cross-Appellant,

v.

STATE of Colorado, et al. Appellees.

No. 83SA502.

Supreme Court of Colorado, En Banc.

June 2, 1986.

As Modified on Denial of Rehearings July 14, 1986.

Fairfield and Woods, Kevin B. Pratt, Howard Holme, Denver, for objectors and appellants, cross-appellees, Southeastern Colorado Water Conservancy Dist.

Mitchell & Mitchell, Rexford L. Mitchell, Rocky Ford, for objectors and appellants, cross-appellees, Catlin Canal Co., High Line Canal Co., and Arkansas Valley Ditch Assn.

Shinn Lawyers, Carl M. Shinn, Thomas L. Shinn, Wendy S. Shinn, Lamar, for objectors and appellants, cross-appellees, District 67 Irr. Canal Ass'n and Amity Mut. Irr. Co.

Calkins, Kramer, Grimshaw & Harring, Wayne B. Schroeder, Bruce D. Bernard, Jonah M. Staller, Denver, Lefferdink & Davis, John J. Lefferdink, Lamar, for applicant, appellee, and cross-appellant, Fort Lyon Canal Co.

Kelly, Stansfield & O'Connell, Timothy J. Flanagan, Denver, for appellee, Public Service Co.

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Wendy C. Weiss, First Asst. Atty. Gen., William A. Paddock, Sp. Asst. Atty. Gen., David Ladd, Asst. Atty. Gen., Denver, for appellees, Colorado Div. of Wildlife and Robert W. Jesse, Div. Engineer.

Harvey M. Curtis, Denver, for appellee, City of Broomfield.

John U. Carlson, Denver, for amicus curiae, City of Westminster.

Broadhurst & Petrock, Kenneth L. Broadhurst, J.J. Petrock, Frederick A. Fendell, III, Ronald D. Hutchinson, Denver, for amicus curiae, City of Thornton.

Fischer, Brown, Huddleson & Gunn, William H. Brown, Fort Collins, for amicus curiae, Cache La Poudre Water Users Assn.

ERICKSON, Justice.

This appeal involves the interpretation and construction of the Water Right Determination and Administration Act of 1969. §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1985 Supp.). The joint applicants, Fort Lyon Canal Company (Fort Lyon) and the Colorado Department of Natural Resources, Division of Wildlife (Division of Wildlife or Division), filed three applications for a change of storage rights in

three reservoirs. Fort Lyon individually filed a fourth application for approval of a plan for augmentation. Several objecting parties (objectors) responded with statements of opposition. The District Court, Water Division Number 2, consolidated all applications for trial and entered separate decrees approving the four applications with court-decreed conditions and modifications. The objectors appeal the court's approval of the applications, and Fort Lyon cross-appeals one of the decreed modifications.

The Fort Lyon/Division of Wildlife applications involve a number of decrees of water rights which are diverse in geographic location, manner of use, and date of priority. The six objectors make various legal and factual arguments on appeal contesting the following findings and conclusions in the water court's final decrees: (1) the State of Colorado is not prohibited by Article XI, section 2 of the Colorado Constitution from purchasing stock in a mutual ditch company or exchanging the stock with another ditch company; (2) all ditch company stockholders are not indispensable parties under C.R.C.P. 19 in an action to change water rights; (3) the four applications in no respect violate the terms of the "Arkansas River Compact"; and (4) "return flows" from the use of certain decreed water rights need not be maintained at historical levels when a water right is "changed" by the water court. Fort Lyon cross-appeals the water court decree ordering a reduction in the amount of water Fort Lyon is entitled to divert from the Arkansas River. Because the water court's findings and conclusions on the issue of historic return flows are contrary to Colorado law, we reverse the water court's final decrees and remand to the water court for additional findings and modifications of the decrees. On all other issues we affirm the findings of the water court.

## I.

### Facts

A review of the facts before the water court is essential to the resolution of the issues before us on appeal.

## A.

### Fort Lyon Canal Geography

The Fort Lyon Canal Company is a mutual ditch irrigation company, incorporated in 1897, which owns the Fort Lyon Canal and the Fort Lyon Storage Canal on the Arkansas River (Arkansas or River) in southeastern Colorado (the map of the Fort Lyon system in Appendix 1 includes all of the canals and reservoirs referred to in this opinion). The main canal headgate is located approximately six miles west of La Junta, and the Canal extends more than one hundred miles eastward, parallel to the north bank of the Arkansas River, terminating northeast of Lamar. As of 1980, more than 300,000 acre-feet (a.f.) of water was diverted annually into the main canal from the Arkansas, and the Fort Lyon water irrigates approximately 93,000 acres of agricultural land on the north bank of the River.

The storage canal headgate is located some twenty miles upstream from the main canal headgate. The storage canal extends about forty miles in a northeasterly direction and terminates in a storage reservoir used by Fort Lyon. The storage canal and main canal are interconnected by an extensive network of reservoirs and natural and man-made watercourses used by Fort Lyon and other irrigation companies. Fort Lyon serves as a "feeder" for several independently owned irrigation canals and reservoirs downditch from the Fort Lyon Main Canal headgate. Fort Lyon owns many direct-flow and storage priorities on the Arkansas River, including several very senior priorities predating 1900.

Four reservoirs which are part of the Fort Lyon complex are tied into the factual issues in the present case. The Horse Creek Reservoir (sometimes referred to as Horse Creek) and Adobe Creek Reservoir (sometimes referred to as Adobe Creek) are fed by the storage canal and have outlets in the main canal. Both are used to store water for later release into the main canal

for downditch irrigation.[1] Horse Creek is filled using priorities dating from 1900 to 1910 (the priorities have been decreed for storage). Adobe Creek is filled using six priorities dating from 1906 to 1910. Queen Reservoir (sometimes referred to as Queen; also known as Nee Skah Reservoir), at the east end of the system, is part of the Great Plains Reservoir System, a canal and storage complex not owned by Fort Lyon but supplied through Fort Lyon Canal under an 1897 contract. Fort Lyon has a retained right to store and consume a portion of the water delivered to the Great Plains System. John Martin Reservoir (sometimes referred to as John Martin) is a large, onstream reservoir, more than ten miles in length, located in the main channel of the Arkansas River between Las Animas and Lamar.

### B.
### *Division of Wildlife Permanent Pool*

The Colorado Department of Natural Resources, Division of Wildlife, has attempted since the late 1950's to supply additional water to the John Martin Reservoir to create a permanent wildlife and recreational pool. The additional water is necessary to offset the large annual fluctuations in water depth in John Martin. In 1969, the General Assembly appropriated more than one million dollars specially earmarked to acquire water rights to create a permanent wildlife and recreation pool in John Martin. In the early 1970's, the Division of Wildlife used the funds to purchase 2,097.58 shares in the Catlin Canal Company, an independent mutual ditch company with its headgate twenty-five miles upstream from the Fort Lyon main headgate. In 1973, the state filed an application with the Division 2 Water Court to change the nature and

place of use of its Catlin water rights from domestic and irrigation purposes in Otero County to storage in John Martin Reservoir for fish propagation, wildlife development, and other recreational purposes. The Division 2 Water Court dismissed the application as a violation of the articles of incorporation and bylaws of the Catlin Canal Company.

### C.
### *Fort Lyon/Division of Wildlife Contract*

In 1979, the Division of Wildlife negotiated an agreement with the Fort Lyon Canal Company whereby the Division would transfer its Catlin water rights to Fort Lyon, and, in exchange, Fort Lyon would supply the Division with water from the Fort Lyon Canal for use in the permanent pool in John Martin Reservoir. The Division and Fort Lyon then filed a joint application with the Division 2 Water Court to implement the exchange agreement. The water court again denied the application based on the Catlin bylaws, which require that the Catlin directors approve a change in use of Catlin water and be given a reasonable time to consider the change in use. We affirmed the water court dismissal of the joint application. *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501 (Colo.1982).

### D.
### *Joint Applications for Change of Storage Rights*

In late 1979 and early 1980, after allowing a reasonable time for the Catlin directors to approve the change, Fort Lyon

---

**1.** Colorado water law makes a distinction between rights to immediately apply streamflows to a beneficial use, termed "direct flow rights," and rights to divert streamflows into a storage reservoir to be retained for release and use later, termed "storage rights." The Colorado Constitution guarantees that the "right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied." Colo. Const. art. XVI, sec. 6. The Colorado statutes provide that "(t)he right to store water

of a natural stream for later application to beneficial use is recognized as a right of appropriation under the Colorado constitution." § 37–87–101(1), 15 C.R.S. (1985 Supp.). Thus storage rights, like direct-flow rights, are administered under the Water Right Determination and Administration Act of 1969. The Act defines "storage" as "the impoundment, possession, and control of water by means of a dam." § 37–92–103(10.5), 15 C.R.S. (1985 Supp.).

and the Division filed the three joint applications at issue here to implement the exchange agreement. The three applications together provide for a change of storage rights in Adobe Creek, Horse Creek, and Queen Reservoirs from irrigation use to supplying 5,000 a.f. annually to create the permanent pool in John Martin Reservoir for wildlife preservation and recreation uses. Fort Lyon singly also filed a fourth application for a plan for augmentation to change direct-flow decrees to storage decrees. The four applications for change of water rights are the subject of the present appeal.

The three Division of Wildlife/Fort Lyon joint applications propose that a maximum aggregate (from all three reservoirs) of 5,000 a.f. annually be transferred from Fort Lyon storage rights in Adobe Creek, Horse Creek, and Queen to the John Martin permanent pool. The Adobe Creek Reservoir application was filed on October 25, 1979 (No. 79CW160). Fort Lyon owns several storage priorities for Adobe Creek totaling 87,000 a.f. and dating from 1906 through 1910. The water use would be changed from agricultural irrigation for the water stored in Adobe Creek to a permanent pool for fish, wildlife, and recreation uses in John Martin. The place of diversion for the water would remain the Fort Lyon Storage Canal. The Division of Wildlife is listed as a co-applicant on the application, and the only mention of the Fort Lyon/Division of Wildlife water exchange contract appears in paragraph 5(f) of the application: "The water rights described are owned by the Fort Lyon Canal Company. The co-applicant has an interest in the water rights pursuant to the terms of a Fort Lyon-Division of Wildlife contract."

The Horse Creek Reservoir application was also filed on October 25, 1979 (No. 79CW161). Fort Lyon owns several storage priorities for Horse Creek totaling 28,-000 a.f. and dating from 1900 through 1910. The Horse Creek application is identical to the Adobe Creek application. The place of diversion for the Horse Creek storage rights would remain the same, and paragraph 5(f) of the Horse Creek application (describing the Fort Lyon/Division of Wildlife contract) is also identical to the Adobe Creek application.

The Queen Reservoir application was filed on January 30, 1980 (No. 80CW51). Queen is part of the Great Plains Reservoir System at the east end of the Fort Lyon Main Canal. Queen is supplied through the Santanta and Kicking Bird Canals, which are branches of and supplied by the Fort Lyon Main Canal but which are not owned by Fort Lyon. Fort Lyon shares storage rights in Queen with other users under one 1896 priority for an aggregate total of 265,-552 a.f. Fort Lyon's share totals 5,483 a.f. The diversion point under the exchange plan would remain the Fort Lyon Main Canal. The Queen application contains the same cursory description of the Fort Lyon/Division of Wildlife contract as is contained in the Adobe Creek and Horse Creek applications.

### E.

### *Plan for Augmentation*

The fourth application at issue is Fort Lyon's plan for augmentation,[2] which was filed on December 24, 1979 (No. 79CW178). Among its numerous priorities, Fort Lyon owns three direct-flow priorities for the Arkansas River dated 1884, 1887, and 1893, totaling 933 cubic feet per second (c.f.s.). Fort Lyon historically diverted water under

**2.** The 1969 Act provides:

"Plan for augmentation" means a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of

water, or by any other appropriate means. "Plan for augmentation" does not include the salvage of tributary waters by the eradication of phyreatophytes, nor does it include the use of tributary water collected from land surfaces which have been made impermeable, thereby increasing the runoff but not adding to the existing supply of tributary water. § 37–92–103(9), 15 C.R.S. (1985 Supp.).

the three priorities at the Fort Lyon Main Canal headgate throughout the year whenever water was available.

Since 1975, Fort Lyon has diverted and stored under several storage decrees approximately forty-five percent of the total flow of the Arkansas River available for storage use from November 16 to March 15. While wintertime irrigation is practiced in southeastern Colorado, it is significantly more difficult, less efficient, and more consumptive of water than irrigation during the warm months. As a result, many water users store wintertime direct flows for use during the summer season. Fort Lyon's plan for augmentation proposes that the three direct-flow priorities totaling 933 c.f.s. be diverted from November 16 to March 15 into the Fort Lyon Storage Canal (upstream from the Main Canal headgate) and stored in Fort Lyon's reservoirs for use during the summer irrigation season. The diverted water would be divided for storage between Horse Creek Reservoir, Adobe Creek Reservoir, and John Martin Reservoir. The water diverted to John Martin would be added to the 5,000 a.f. permanent wildlife and recreation pool. The augmentation plan contemplates a change in type and time of use, historical consumptive use, and point of diversion. The application also stated that:

> [N]ot more than forty-five percent (45%) of the waters of the Arkansas River available for storage shall be diverted under the applicant's direct flow priorities in any one winter storage period, and provided further that none of the water diverted under the direct flow priorities during the winter storage period shall be applied to croplands for irrigation during that period.

## F.

### Water Court Findings, Orders, and Decrees

By motion of the objectors, the Division 2 Water Court consolidated the four applications on August 15, 1980 for trial, but separate decrees were to be entered for each application. The court's consolidation order also allowed Fort Lyon to delete the reference in its plan for augmentation to the wildlife and recreation pool in John Martin Reservoir.

### 1. Preliminary Issues

The water court conducted a hearing on several preliminary issues on July 10, 1981 and issued its rulings on the issues on July 24, 1981. The court ruled that: (1) Fort Lyon could legally use its water rights for recreational purposes assuming it first obtained a proper water court decree for change of use; (2) the shareholders of Catlin Canal Company (in which the Division of Wildlife owns water rights) were not indispensable parties for the water court action on the four applications; (3) a ditch company may obtain decrees to change the use of its water rights; (4) it is not a violation of the Colorado Constitution or statutes for the State of Colorado to purchase shares in a mutual ditch company; and (5) the 1979 exchange agreement between Fort Lyon and the Division of Wildlife is valid and enforceable.

### 2. Change of Storage Rights

The trial on the consolidated applications commenced on May 11, 1982. The Division 2 court granted all four change-of-water-right applications and issued consolidated factual findings and legal conclusions along with four separate decrees for the applications on July 19, 1983. The court held that transfers of storage rights which result in a change of use are allowable in Colorado under *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968), provided there is no injury to the vested rights of other users. The water court held that certain aspects of the Fort Lyon applications would injure other appropriators on the River if Fort Lyon's water rights were changed exactly as applied for. As a result, the water court findings and decrees ordered extensive limitations and modifications to the Fort Lyon applications, and Fort Lyon itself agreed in a stipulation with various objectors to limit certain of its diversions to avoid injury to the objectors.

The water court adopted the stipulations as part of the final decrees.

The decreed modifications include the following: (1) Fort Lyon is to be charged with all transit losses caused by the transfer of stored water from Horse Creek, Adobe Creek, and Queen Reservoirs to John Martin Reservoir pursuant to the exchange agreement with the Division of Wildlife; (2) Fort Lyon can divert a cumulative, absolute maximum of 5,000 a.f. annually into the John Martin permanent pool under the storage rights transferred from Horse Creek, Adobe Creek, and Queen Reservoirs.

### 3. *Plan for Augmentation*

With regard to the Fort Lyon Plan for Augmentation, the water court decreed the following conditions: (1) although water users downstream from John Martin Reservoir (an area known as "District 67" between John Martin and the Kansas border) will not be injured by Fort Lyon's storage of direct-flow rights from November through March (because there is practically no wintertime irrigation), Fort Lyon must limit its diversions during the winter storage period to its historical average both for the cumulative winter storage period in total and also for any individual month during the storage period. The historical diversion averages are significantly smaller than the decreed "paper" right to divert 933 c.f.s.; (2) Fort Lyon cannot place a "call on the river" to enforce its senior 1887 direct-flow priority during the winter storage season; (3) Fort Lyon can store the augmentation water in its reservoirs and release it only once during the storage season—once water is in storage it must remain in storage and, once released, it must remain out of storage; (4) Fort Lyon must bypass 1,000 a.f. to John Martin Reservoir during the winter storage period for immediate use by downstream users in District 67. The downstream users traditionally consume only 600 a.f. during the winter period; and (5) the augmentation plan proposes that Fort Lyon's winter direct-flow rights decreed for diversion at the main canal headgate be diverted for storage at the storage canal headgate, miles upstream from the main canal. To avoid any unfair benefit to Fort Lyon that the change in diversion point might cause, Fort Lyon must reduce or shut the storage canal headgate whenever the Colorado State Engineer determines that frozen water or any other condition at the main canal headgate will obstruct all or part of Fort Lyon's historic winter diversions.

### II.

### *Appellants-Objectors*

The appellants-objectors (objectors) appeal various aspects of the factual findings and final decrees entered by the water court.

### A.

### *State Purchase of Ditch Company Shares*

The objectors claim that the Colorado Division of Wildlife's purchase of shares in the Catlin Canal Company and the 1979 contract agreement between the state and Fort Lyon both violate the Colorado Constitution. The water court determined that the state involvement was not a constitutional violation. The State Division of Wildlife purchased more than 2,000 shares in Catlin Canal, a "mutual ditch company" under Colorado law. *See Nelson v. Lake Canal Co. of Colorado,* 644 P.2d 55 (Colo. App.1981) (A "mutual ditch company" is organized purely to benefit its shareholders, who individually own corporation shares representing water rights. "Carrier ditch companies" are not owned by the users and sell water for profit to any willing buyer.).

Article XI, section 2 of the Colorado Constitution provides, in part, that:

Neither the state, nor any county, city, town, township, or school district shall make a donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company, or a joint owner with any person, company, or corporation, public or private, in or out of

the state, except as to such ownership as may accrue to the state by escheat, or by forfeiture, by operation or provision of law; and except as to such ownership as may accrue to the state or to any county, city, town, township, or school district, or to either or any of them, jointly with any person, company, or corporation, by forfeiture or sale of real estate for nonpayment of taxes, or by donation or devise for public use, or by purchase by or on behalf of any or either of them, jointly with any or either of them, under execution in cases of fines, penalties, or forfeiture of recognizance, breach of condition of official bond, or of bond to secure public moneys, or the performance of any contract in which they or any of them may be jointly or severally interested.

The provision was originally enacted to prevent state ownership of, and financial support for, new railroads within the state. *See Colorado Central Railroad Co. v. Lea,* 5 Colo. 192 (1879).

### 1. *Special Status of Mutual Ditch Companies*

A long line of Colorado cases holds that mutual ditch companies are not "true" corporations in a legal sense but merely vehicles for individual ownership of water rights. For example, in *Jacobucci v. District Court,* 189 Colo. 380, 541 P.2d 667 (1975), we held that all individual stock owners in a mutual ditch company were indispensable parties in a condemnation action against the ditch company. We stated that mutual ditch companies were formed expressly for the purpose of furnishing water to shareholders, and not for profit. The ditch company is merely the vehicle by which the cooperative owners manage the common areas of the irrigation canal, such as the headgates and canal channel. We determined that "the unique character of these corporations mandates different treatment which is not fully in accord with the principles applicable to corporations in general." 189 Colo. at 388, 541 P.2d at 672.

In *Billings Ditch Co. v. Industrial Commission,* 127 Colo. 69, 253 P.2d 1058 (1953), we held that the water administered by a mutual ditch company is actually owned by the stockholders who own the farms served by the ditch, "the shares of stock being merely incidental to the ownership of the water rights.... [T]he practice and policy adopted by a corporation in its operation, rather than the language contained in its articles of incorporation, are determinative of its character." *Id.* at 74, 253 P.2d at 1060. *Beaty v. Board of County Commissioners,* 101 Colo. 346, 73 P.2d 982 (1937), also held that when a mutual irrigation company is organized for the convenience of its members rather than for profit, ownership of the company's shares is merely incidental to the ownership of the real property water rights the shares represent.

Mutual ditch companies are incorporated and operated under special statutory provisions, §§ 7–42–101 to –117, 3 C.R.S. (1973 & 1985 Supp.), rather than the general Colorado corporation statutes, §§ 7–1–101 to –10–112, 3 C.R.S. (1973 & 1985 Supp.). Unlike other corporations, mutual ditch companies receive special constitutional and statutory exemptions from state property taxation. Article X, section 3(1)(d) of the Colorado Constitution specifies that canals owned and used by corporations to irrigate land owned by the corporation shareholders are exempt from state property taxation. *See also* § 39–3–101(1)(c), 16B C.R.S. (1982); *Shaw v. Bond,* 64 Colo. 366, 171 P. 1142 (1918). Finally, the funds used by the Division of Wildlife in the present case to purchase the water shares in Catlin Canal were entirely appropriated for that purpose by the General Assembly.

In view of the special treatment in the Colorado Constitution and statutes, the intent of the General Assembly, and our long line of decisions on the issue, it is clear that stock ownership in a mutual ditch company constitutes ownership of a real property interest in water rights rather than a personal property interest in corporate stock. *Beaty v. Board of County Commissioners,* 101 Colo. at 351, 73 P.2d

at 985. We are persuaded that Article XI, section 2 of the Colorado Constitution, which prohibits state ownership of corporate stock, was never intended to prohibit state ownership of shares in a mutual ditch company.

### 2. *Powers of the Division of Wildlife*

The Colorado statutes empower the Department of Natural Resources, Division of Wildlife, to promote, advance, and administer the interests of the state in public recreation, protection of the environment, and preservation of wildlife habitats. §§ 24–65–102, 24–65.1–101, 24–65.1–107, 10 C.R.S. (1982). *See generally* White, *The Emerging Relationship Between Environmental Regulations and Colorado Water Law*, 53 U. Colo.L.Rev. 597 (1982). The Division of Wildlife is specifically empowered to purchase water rights. § 33–1–105, 14 C.R.S. (1984). The General Assembly also has the power to appropriate funds from the state treasury to purchase property for use by state executive agencies to promote their statutory purposes. *See* Colo. Const. art. V, §§ 1, 33; § 24–75–101, 10 C.R.S. (1982).

■ The Colorado Department of Natural Resources, Division of Wildlife, may purchase water rights shares in a mutual ditch company to create a permanent wildlife and recreation pool in John Martin Reservoir.

### B.
### *Fort Lyon/Division of Wildlife Contract*

■ The objectors argue that the 1979 contract between the Division of Wildlife and Fort Lyon is also a violation of Article XI, section 2 of the Colorado Constitution (quoted above in Part II–A). The contract provided for: (1) an exchange of a contract right to receive Fort Lyon water (without an actual transfer of Fort Lyon decrees) in consideration for an outright transfer to Fort Lyon by the Division of Wildlife of its Catlin shares; and (2) a plan for the state to pay part of Fort Lyon's legal expenses in the present action. The contract was contingent on its ratification by Fort Lyon stockholders.

Subsection 33–1–105(1)(a), 14 C.R.S. (1984), authorizes the Division of Wildlife to acquire by "long-term operating agreement" an interest in water which is, in the judgment of the Division of Wildlife, suitable for the conservation of wildlife. Subsection 33–1–105(1)(b) also authorizes the Division to exchange a vested water right in consideration for acquiring a contract interest in a water right owned by another. We have already determined that the Division of Wildlife is not prohibited from purchasing water right shares in the Catlin Canal. The Division is clearly authorized to form an agreement to exchange the Catlin shares for a contract right to use Fort Lyon water rights to supply the John Martin Reservoir wildlife and recreation pool.

### C.
### *Catlin Canal Stockholders*

The water court ruled that the numerous other stockholders in the Catlin Canal Company were not indispensable parties and need not be joined in the water court action on the joint Fort Lyon/Division of Wildlife water applications. The objectors argue that the Division of Wildlife's purchase of Catlin stock and its application to change the place and type of use of the Catlin shares so prejudices the interests of the other shareholders that the water court erred by not joining all Catlin stockholders as indispensable parties to the action under C.R.C.P. 19(a).

■ An indispensable party claim under C.R.C.P. 19 is plainly inapplicable to the present action under the 1969 Water Rights Act. Water adjudication proceedings are "special statutory" proceedings pursuant to C.R.C.P. 81(a), and the Colorado Rules of Civil Procedure do not govern practice in statutory proceedings insofar as they conflict with the procedures provided by special statute. *Colorado River Water Conservation District v. Rocky Mountain Power Co.*, 174 Colo. 309, 486 P.2d 438 (1971) (water adjudication proceedings are

"special statutory" proceedings under C.R. C.P. 81(a)). The 1969 Act specifically allows *"[a]ny person ... who wishes to oppose the application"* for any change in water rights to file a statement of opposition and thereby to become a party in the water court action. § 37–92–302(1)(b), 15 C.R.S. (1985 Supp.) (emphasis added). Potential objectors are notified by publication of the water court resume listing all applications under the 1969 Act. § 37–92–302(3)(a), 15 C.R.S. (1985 Supp.). All Catlin shareholders had actual notice or notice by publication that the Division of Wildlife filed applications to change the use of its Catlin shares, and all shareholders were free to object on any ground. The Catlin Canal Company itself filed a statement of opposition. There was no reason for the water court to consider joining any parties pursuant to C.R.C.P. 19.

### D.

### *Arkansas River Compact*

The objectors claim that the water court decrees granting the four applications in the present case will cause a reduction or change in the historical pattern of "return flows"[3] of water to the Arkansas River, which will violate the provisions of the Arkansas River Compact. The Compact is a treaty between the States of Colorado and Kansas, made in 1948, apportioning the water of the Arkansas River. § 37–69–101, 15 C.R.S. (1973). *See generally Colorado v. Kansas*, 320 U.S. 383, 64 S.Ct. 176, 88 L.Ed. 116 (1943) (concerning the rights of Colorado and Kansas to use Arkansas River water). With some exceptions, the Compact generally provides that water flowing into John Martin Reservoir must remain in storage until "called up" for use

when needed by Colorado or Kansas in quantities limited by the terms of the Compact. Arkansas River Compact, Dec. 14, 1948, Colorado-Kansas, art. V, sec. A, § 37–69–101, 15 C.R.S. (1973).

However, aside from dictating the amount of water to be stored and released from John Martin, the Arkansas Compact does not specifically address the historical pattern of return flows coming from upstream water users. The water court determined that the three applications for change of place of storage to John Martin Reservoir from Horse Creek, Adobe Creek, and Queen Reservoirs would not cause any reduction in stream flow because the change would create a substantial saving in transit and storage losses due to seepage and evaporation. The court-decreed modifications also would increase the stream flow.

The water court also determined that Fort Lyon's augmentation plan to store some of its winter direct-flow rights would not cause injury to other users because the irrigators in District 67 (downstream from John Martin) engage in little wintertime irrigation. Historical flow records show that about 35,000 a.f. of unused water flows over the border into Kansas during the November-to-March winter storage period. By completely cutting off some of its historical return flows as proposed in the plan for augmentation, Fort Lyon would cause no injury to District 67 users during the winter storage period. The water court found that Fort Lyon's augmentation plan would actually benefit downstream users because releasing the stored winter water during the summer season would benefit all downstream users who need water dur-

---

**3.** Most watercourses lie over accompanying groundwater supplies which saturate and flow through underlying permeable formations of rock, gravel, or sand (termed the "alluvial aquifer"). It is the policy of the 1969 Act "to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water...." § 37–92–102(1)(a), 15 C.R.S. (1985 Supp.). "Tributary" groundwater is essentially treated as part of surface water supplies for purposes of the 1969

Act. We have previously held that all groundwater which takes less than 100 years to flow into a surface stream is "tributary" groundwater under the 1969 Act. *Kuiper v. Lundvall*, 187 Colo. 40, 529 P.2d 1328 (1974).

"Return flows" means water which, after diversion under a decreed direct flow or storage right, seeps into the groundwater alluvial aquifer and returns to the stream from which it was diverted.

ing the dry, summer irrigation season. The Arkansas, like many Colorado watercourses, is badly overappropriated during periods of peak use.

The water court also found that the plan for augmentation would cause a substantial reduction in return flows from mid-March through the following June, after the winter storage period ends on March 15. The Division Engineer argues that the reduction in return flows during the spring may alter the regimen of the River in a manner that violates the Arkansas Compact. He notes that certain of the springtime return flows above John Martin Reservoir go into the "conservation storage pool" of the reservoir. Pursuant to the Compact, water stored in the conservation pool is released during the summer upon demand by downstream users in Colorado and Kansas. While water remains in the conservation pool, downstream appropriators may not exercise their priorities against users diverting water above the reservoir. If the amount in the conservation pool is reduced because of the reduction in springtime return flows, the conservation pool will be depleted earlier than is normal, resulting in an earlier-than-normal call by downstream appropriators with senior priorities.

■ Fort Lyon argues that this effect will not occur because any reduction in the conservation pool will be offset by the increase in late-summer return flows below the reservoir resulting from the augmentation plan. The findings of the water court are not sufficient to evaluate this argument. As part of our holding in these consolidated cases, we are remanding the plan-for-augmentation decree to the water court for evaluation of the possible injuries to other appropriators that may result from the reduction in springtime return flows. *See infra* pp. 147–148. As part of that inquiry, the water court should determine whether the reduction in springtime return flows affects the operation of the conservation pool and, if so, whether additional conditions must be imposed on the plan for augmentation to assure compliance with the Arkansas Compact.

■ The Arkansas Compact does not specifically require the maintenance of historical return flows, and, except for the narrow issue raised by the Division Engineer, the reduction in return flows caused by Fort Lyon's augmentation plan will not otherwise violate the Compact or infringe on the treaty rights of the State of Kansas. Accordingly, we evaluate all four applications under Colorado law.

## E.
### *Historic Return Flows*

The objectors argue that the court decrees allowing Fort Lyon to change the use of storage rights and allowing direct-flow rights to be stored will reduce the traditional amount of return flows to the River which are available for other appropriators. According to the objectors, the decrees thereby injure downstream users and should be modified to prevent or compensate the reduction in return flows.

### 1. *City of Westminster v. Church*

The water court stated twice during the trial that the joint Fort Lyon/Division of Wildlife applications needed modification to prevent injury to other users because of diminished return flows. In its final decree, however, the water court relied on *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968), for the proposition that storage rights can be transferred to alternate places of storage without considering diminished return flows caused by the change in historical use. *Westminster*, a pre–1969 Water Act case, involved a suit by junior appropriators on Coal Creek to restrain the City of Westminster from changing the historical use of direct-flow and storage rights purchased by Westminster from an agricultural irrigator. The city proposed to use the water in a continuous flow for municipal supplies instead of the intermittent irrigation practiced by the previous owner. The trial court held that the storage rights were limited to historical levels of use. We reversed and held that Westminster could change the use of the stored water to municipal supplies because "[c]hange of use does not create a greater

burden as to storage water." 167 Colo. at 14, 445 P.2d at 58.

*Westminster* also reiterated the rule that an application to change the use or diversion point of direct-flow rights is strictly limited to the amount of water actually historically diverted rather than the full amount of the "paper decree." In *Westminster*, we used "historical use" to mean the actual amount of water historically *diverted* under the decrees.

*Farmers Highline Canal and Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629 (1954), decided before *Westminster*, states the rule that diminished return flows caused by a change in water rights may injure other appropriators. However, *Westminster* quotes language from *Farmers Highline Canal* that refers only to limits imposed on headgate diversions based on the amount of water historically diverted and also on the "duty of water" (the amount of water necessary to efficiently grow crops on the land benefited by the water decree). *Westminster*, 167 Colo. at 15, 445 P.2d at 58 (quoting *Farmers Highline Canal*, 129 Colo. at 584, 272 P.2d at 634). *Westminster* in no way cites or refers to the portion of *Farmers Highline Canal* that discusses the return-flow issue.

There is no language in *Westminster* or any other factual indication that we or the trial court in *Westminster* considered diminished return flows in evaluating Westminster's application for change in water rights, whether direct flow or storage. We held only that a change in *storage* rights is not limited to amounts historically diverted and that a change in *direct-flow* rights is limited to historical diversions and the duty of water. We affirmed the trial court's decreed limits on the amount of water diverted by Westminster under the changed direct-flow rights. 167 Colo. at 16, 445 P.2d at 59. We reversed the trial court's limits on diversions under the changed storage rights. *Id.*

2. *Standards for Evaluating a Change in Water Rights*

The 1969 Water Rights Act lists various factors to be considered by the water court in evaluating applications for changes in water rights. Subsection 37–92–103(5), 15 C.R.S. (1973), part of the definitional section, states:

"Change of water right" means a change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage, or any combination of such changes.

It is clear that the 1969 Act includes both a change in the place of storage and a change from direct flow to storage (such as Fort Lyon's plan for augmentation) within the definition of "change of water right," a phrase with specialized meaning in the 1969 Act. The Act also specifies when an application for "change of water right" should be granted by the water court:

A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. If it is determined that the proposed change or plan as presented in the application would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

§ 37–92–305(3), 15 C.R.S. (1973).

Our cases, decided both before and after passage of the 1969 Act, also make clear

that applications for change in water rights are to be rejected or modified if users of vested water rights would thereby suffer injury. The applicant for a change of water rights has the burden of showing the absence of injurious effect. *Southeastern Colorado Water Conservancy District v. Rich*, 625 P.2d 977 (Colo.1981); *see* §§ 37–92–302(1)(a), –305(3), 15 C.R.S. (1973 & 1985 Supp.).

### 3. Maintenance of Historical Use and Return Flows

*Weibert v. Rothe Brothers, Inc.*, 200 Colo. 310, 618 P.2d 1367 (1980), for example, involved an application for a plan for augmentation under which the Rothe Brothers would commit fifteen existing direct-flow rights to augment water extracted in a proposed new well to be drilled by Rothe to draw water from the South Platte River. Rothe also applied to change the place of diversion and place of use of rights decreed in an existing, nearby well. The water court granted the application with modifications. We reversed the water court judgment in part and remanded with directions to make several factual findings. We held that: (1) the right to change the point of diversion or use of water rights decreed for agricultural irrigation is limited to the "duty of water," that amount of water necessary to efficiently grow crops at the decreed place of use; (2) the right to change a diversion point or place of use is limited in quantity and time by historical use; (3) junior appropriators have vested rights in the continuation of stream conditions as they existed at the time of their appropriations; and (4) where the objectors claim injury because of expansion of use, the applicant has the burden of establishing historical use. *Id.* at 316–17, 618 P.2d at 1371–72.

In *Danielson v. Kerbs Ag., Inc.*, 646 P.2d 363 (Colo.1982), Kerbs was sued by the state engineer for using his decreed water rights to irrigate lands not included in the decrees. We held that, although there was no increase in the amount of water withdrawn by Kerbs, the water court should have considered whether a reduction in the return flow of water would injure other appropriators. "The historical use of a particular water right is not measured solely by the amount of water withdrawn and applied to beneficial use, but *also by the amount of return flow.*" *Id.* at 373 (emphasis added).

We also referred to the requirement to maintain historic return flows in *Cache la Poudre Water Users Association v. Glacier View Meadows*, 191 Colo. 53, 550 P.2d 288 (1976), where we affirmed decrees granting the applicant's plan for augmentation. *See also Trowell Land & Irrigation v. Bijou Irr. District*, 65 Colo. 202, 176 P.2d 292 (1918); *Comstock v. Ramsay*, 55 Colo. 244, 133 P. 1107 (1913).

The water court here, in its consolidated judgment and decree, held as a matter of law that storage rights can be changed without considering diminished return flows and resulting injury to other users:

> Storage rights are not limited to historical use in considering a transfer of the right. *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968). That case also stands for the proposition that change of use does not create a greater burden as to storage water. A reservoir right permits one filling of the reservoir per year. Change of use does not create a greater burden as to storage water.

The court's reliance on *City of Westminster v. Church* is misplaced. As discussed above, *Westminster* does not stand for the proposition that return flows should not be considered in evaluating injuries caused by changes in direct flow or storage rights. To the extent that some of our language in *Westminster* may be interpreted to disregard return-flow injuries due to a change in storage rights, our holding here clarifies *Westminster* on the issue of injuries caused by diminished return flows. The 1969 Water Rights Act and our recent cases make very clear that diminished return flows, whether due to change in direct-flow or storage rights, must be considered when calculating the amount of

injury to other appropriators. The court's decrees must prevent or compensate such injuries by ordering appropriate modifications and conditions.

### 4. *Modification of Applications for a Change in Water Rights*

The 1969 Act provides guidelines on the modifications to impose when an application for a change in water rights or a plan for augmentation injures other appropriators:

**(4) Terms and conditions to prevent injury as specified in subsection (3) of this section may include:**

(a) A limitation on the use of water which is subject to the change, taking into consideration the historic use and the flexibility required by annual climatic differences;

(b) The relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary to prevent an enlargement upon the historic use or diminution of return flow to the detriment of other appropriators;

(c) A time limitation on the diversion of water for which the change is sought in terms of months per year;

(d) Such other conditions as may be necessary to protect the vested rights of others.

.    .    .    .    .

(8) In reviewing a proposed plan for augmentation and in considering terms and conditions which may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water which would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right.

§ 37–92–305(4), –305(8), 15 C.R.S. (1973 & 1985 Supp.).

### 5. *Evidence and Findings on Diminished Return Flows*

In the present case there is overwhelming and undisputed evidence that the applicants' change of storage rights and plan for augmentation will cause increased consumptive use and diminished return flows, thereby injuring the vested rights of the objectors and other appropriators on the Arkansas River.

Fort Lyon's own uncontroverted exhibits and expert testimony establish that a total of approximately 5,000 a.f. of water annually returns to the Arkansas River from the Horse Creek, Adobe Creek, and Queen Reservoirs by way of groundwater flow due to reservoir seepage, canal seepage, and return flow from agricultural irrigation. Fort Lyon's engineer also testified that there was a clear, predictable pattern to the historic timing and amount of return flows from the three reservoirs.

The record also indicates that the transfer of water (maximum 5,000 a.f. annually) from the three Fort Lyon reservoirs to form a permanent wildlife and recreation pool in John Martin Reservoir will diminish the quantity of return flows. The recreation pool in John Martin, because it is permanent, is mainly consumed by evaporation rather than by groundwater seepage. Little of the water in permanent storage returns to the River. The transfer of storage water to John Martin will diminish historic return flows and injure the vested water rights of the objectors and other appropriators on the Arkansas.

■ Nonetheless, the water court, relying on an incorrect reading of *Westminster v. Church*, failed to enter specific, detailed factual findings of the various quantities and ways that the applications will diminish or change the patterns of historical consumptive use and return flows. The court also failed to impose conditions and modifications in its decrees to offset the injuries to other appropriators.

As to the Fort Lyon plan for augmentation, the water court specifically found that the plan to store direct-flow rights for summer release would diminish traditional return flows *above* John Martin Reservoir approximately 1,500 a.f. during the winter storage period. The water court also specifically found that the additional loss of winter-storage-period return flows *below* John Martin would cause no injuries because Colorado water users on the Arkansas River below John Martin have ceased irrigation during the winter storage period. Of course any wintertime return flows above John Martin can be stored in the Reservoir until needed. Thus the 1,500 a.f. reduction in wintertime return flows above the Reservoir would almost certainly injure Colorado water users downstream from John Martin and also the Las Animas Consolidated ditch, which has its headgate just upstream from John Martin. Accordingly, the water court imposed extensive modifications and conditions on the plan for augmentation to offset and compensate the injuries to water users caused by the 1,500 a.f. of return flows lost above John Martin Reservoir during the winter storage period.[4]

However, the water court's consolidated decree and augmentation decree also clearly list diminished return flows in the total amount of 1,430 a.f. above and below John Martin Reservoir during the months of April through June, after the winter storage period ends on March 15.[5] Despite this finding, the water court failed to make any factual determination of injuries to other water users caused by the diminished springtime return flows or to impose conditions on the plan for augmentation to compensate the possible injuries.

### III.

#### *Fort Lyon Cross-Appeal*

The Great Plains System is operated by objector Amity Mutual Irrigation Company. The storage capacity of Queen Reservoir is shared by Amity and Fort Lyon under the Great Plains decree. The water for both Fort Lyon and Amity is diverted from the Arkansas River through the Fort Lyon Main Canal headgate, and the water then travels downditch to the "bifurcation gate" of the Kicking Bird Canal, which branches northeasterly to the Great Plains System. The water owned separately by Fort Lyon and Amity remains "mixed" as it travels downditch through Kicking Bird until it reaches the Great Plains System and ultimately Queen Reservoir.

The conglomeration of Fort Lyon and Amity water destined for Queen Reservoir has long been in dispute as to: (1) whether

---

**4.** Paragraph 26 of the water court's consolidated decree provides:

> Fort Lyon's Winter Storage Period return flows which would otherwise have returned above John Martin Reservoir during the Winter Storage Period, and which would later be used by Colorado users, must be accounted for and delivered to the Conservation Pool in John Martin each winter. The Winter Storage Period volume of return flows returning to the river above John Martin is estimated to be about 1500 acre-feet annually of which about 500 acre-feet had been available to and were diverted by the Las Animas Consolidated and Consolidated Extension. Fort Lyon has agreed to bypass 500 acre-feet of water each year to the Consolidated headgate during the irrigation season as provided by a stipulation between Fort Lyon and Public Service Company, and the Court approves the stipulation. Fort Lyon has therefore accounted for 500 acre feet of the 1,500 acre feet which has returned to the river during the Winter Storage Period. Forty percent (40%) of the 1,000

acre feet has been used by Kansas under the provisions of the Arkansas River Compact. The remaining 600 acre feet of water (or 60%) has been used by water users in Water District 67 under the provisions of the Arkansas River Compact. Although Fort Lyon's obligation to District 67 waters is quantified at 600 acre feet (60% of 1,000 acre feet) during the Winter Storage Period, Fort Lyon consents to a term and condition requiring Fort Lyon to bypass a total volume of 1,000 acre feet to John Martin Reservoir during the Winter Storage Period in order to avoid any potential for injury to Colorado water users.

**5.** The water court found that return flows above and below John Martin Reservoir would be diminished a total of 810 a.f. during the month of March as a whole. However, there is no evidence in the record indicating the amount of return-flow water that would be lost between March 15 and April 1.

Fort Lyon's share of water stored in Queen is to be measured at the Fort Lyon headgate, with Fort Lyon bearing the transit losses, or whether it should be measured when it reaches Queen Reservoir, with Amity bearing the transit losses; (2) what transit loss percentage should be applied to Amity's water; and (3) of the total aggregate amount of water diverted at the Fort Lyon headgate (Fort Lyon water to be stored in Queen plus Amity water to be stored in Queen plus Fort Lyon's other direct flow water), what amount should be apportioned to Fort Lyon's direct-flow rights.

### 1. Water Court Findings

The water court made the following findings: (1) Fort Lyon's storage right in Queen Reservoir under the Great Plains decree is 5,483 a.f.; (2) Fort Lyon must divert additional water at the Fort Lyon headgate to account for transit losses if it wishes to deliver the full 5,483 a.f. at the Kicking Bird gate for storage under the Great Plains decree; and (3) the amount of water lost in transit is 25% of all water transferred between the Fort Lyon headgate and the Kicking Bird bifurcation gate.

The water court decrees accordingly made the following apportionment of water rights: (1) 65,262 a.f. has historically been diverted, in total, at the Fort Lyon Main Canal headgate from November 16 through March 15; (2) since 15,938 a.f. is historically delivered at the Kicking Bird bifurcation gate (the combined Amity and Fort Lyon water stored in Queen under the Great Plains decree), 21,251 a.f. must be diverted at the Fort Lyon headgate to account for 25% transit losses; (3) Fort Lyon's direct-flow priorities during the November through March period therefore must total 65,262 a.f. less 21,251 a.f., or 44,011 a.f.

Fort Lyon now claims that its 5,483 a.f. under the Great Plains decree should be measured at the Kicking Bird bifurcation gate rather than at the Fort Lyon headgate, with Amity bearing the transit losses. Second, Fort Lyon argues that the 25% transit loss estimate applied by the water court was unsupported by the evidence and incorrectly reduced the amount of water that should be apportioned to Fort Lyon's direct-flow rights.

### 2. Fort Lyon Share of Great Plains Decree

■ There is ample evidence in the record to support the water court's finding that Fort Lyon must bear the transit losses from the Fort Lyon headgate when it delivers water for storage in the Great Plains System. The 1897 Great Plains Contract, a 1905 stipulation between Amity and Fort Lyon, a 1905 United States District Court decree, a 1905 agreement, a 1944 Bent County District Court stipulated judgment, and a 1982 *in limine* order on the issue by the Division 2 Water Court in an unrelated case involving Amity (which still lacks a final judgment) all provide ambiguous or conflicting evidence on whether the 5,483 a.f. is to be measured at the Fort Lyon headgate or upon reaching the Great Plains System. The 1982 *in limine* order of the Division 2 Water Court held that Fort Lyon was to bear its own transit losses under the Great Plains decree. In the face of conflicting evidence, the water court did not err by holding that Fort Lyon's 5,483 a.f. storage right in Queen Reservoir under the Great Plains decree should be measured at the Fort Lyon Main Canal headgate.

### 3. Transit Losses

■ There was also sufficient, though conflicting, evidence presented at trial to support the water court's finding that the Great Plains water is subject to 25% transit losses between the Fort Lyon headgate and the Kicking Bird Canal bifurcation gate. A 1927 Bent County District Court decree and 1944 stipulation between Amity and Fort Lyon both provide that transit losses are 25%. In the present case there was no evidence submitted which establishes the actual transit losses for water moved the forty-two miles to the Kicking Bird gate. The expert water engineers who testified on the question gave opinions varying from 5% to 20%. It was not error for the water

court to adopt the 25% transit loss estimate in calculating the final decrees.

Accordingly, we reverse all the Division 2 Water Court final decrees, including the consolidated judgment and decree, in cases 79CW160, 79CW161, 79CW178, and 80CW51, and remand all five decrees to the Division 2 Water Court to enter specific, detailed factual findings of injury to other appropriators or violations of the Arkansas Compact, if any, caused by diminished return flows and to enter additional modifications and conditions in the final decrees to prevent or compensate such injuries to other users or violations of the Compact. The Division 2 Water Court is also directed to conduct additional hearings and collect supplementary evidence as necessary to resolve the remanded issues. In all other respects the findings and decrees of the water court are affirmed.